UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,    )
                            )
                Plaintiff,    )
                            )
           v.           )     No. 3:04-CR-178
                            )     (VARLAN/GUYTON)
MARCUS BLAIR,            )
                            )
                Defendant.    )

## REPORT AND RECOMMENDATION

This case is before the Court on the defendant's Motion to Suppress and Memorandum in Support [Doc. 9]. This Motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). The Court held an evidentiary hearing on August 12, 2005. Assistant United States Attorney Tracee Plowell was present representing the government. Assistant Federal Community Defender Jonathan Moffatt was present representing the defendant, Marcus Blair ("Blair"). The defendant was also present. At the conclusion of the hearing, defense counsel requested and was granted the opportunity to file a post-hearing brief. The defendant's supplemental brief [Doc. 45] was filed on September 9, 2005. The government's post-hearing brief [Doc. 46] was filed on September 23, 2005. The Court took the motion and related filings under advisement on the following day.

The defendant was indicted [Doc. 1] for a single count of possession of fifty grams or more of crack cocaine on March 25, 2004. Blair has moved to suppress [Doc. 9] all evidence and statements stemming from the March 25, 2004 stop of his car, contending:

(1) the officer lacked probable cause or reasonable suspicion to stop

1

him, and

> (2) after he was stopped, the officer detained him for an unreasonable length of time in order to permit the drug detection dog to arrive.

The government argues [Docs. 12 and 46] that the officer had probable cause to stop the defendant for traffic violations, had reasonable suspicion that he was involved in a drug transaction, and did not detain the defendant for an unreasonable length of time.

# I. FACTS

At the August 12, 2005 suppression hearing, the government called Officer Joshua Munday ("Munday") of the Knoxville Police Department ("KPD"). Munday testified that he had worked for the KPD patrolling the West District for five years. He said that in March 2004, he was assigned to patrol the Lonsdale area as a part of the Community Response Team, which focused on narcotics and prostitution. He said that the Lonsdale area consisted of housing projects and other residences and was considered a high drug-trafficking area. He said that he had assisted in hundreds of arrests in this area and that seventy percent of these arrests were for narcotics-related offenses.

With regard to his assignment, Munday testified that he worked undercover, participating in approximately fifty controlled purchases of crack cocaine. He described a hand-to-hand drug transaction as a covert transaction in which he gives prerecorded money, usually in ten and twenty dollar denominations, to a suspect in exchange for a rock of crack cocaine, which might be wrapped in plastic. He said that he also conducted surveillance as a "plain clothes officer" in narcotics investigations, during which he observes a designated location from an unmarked car, often with the aid of binoculars or a video camera.

Munday said that on March 25, 2004, he was working in a plain-clothes capacity in an undercover police car during the evening shift from 4:00 p.m. to midnight. He said that he was working with Officer Jeff Holmes ("Holmes"), his partner of three years. He stated that on that evening, he was on Bishop Street watching a known drug house, a residence for which the KPD had received numerous complaints of drug traffic. He said that he was parked at a house on the same street as the suspect house and was using a set of binoculars, which would magnify objects to eight times their appearance to the unaided eye.

Munday testified that at approximately 10:35 p.m., he saw a boxy, older-model Chevrolet Caprice stop in front of the suspect house and that a black male got out of the car. Munday saw the black male approach the house's owner, who was well known to Munday. Munday saw the two men speak for fifteen to twenty minutes outside of the house and then participate in a hand-to-hand drug transaction. Munday said that during this time, he was communicating via his Nextel telephone with Officer Holmes, who was waiting further down the road, and that he was telling Holmes everything he was seeing. He said that he could see clearly because the street lights were illuminated and he was using his binoculars.

Munday testified that he told Holmes that a black male, whom he had just observed in a possible drug transaction, was getting into a boxy, older-model Chevrolet Caprice and preparing to leave the suspect house. Munday said the Caprice proceeded on Bishop Street, passing in front of the location where he was parked, and rolled through a stop sign without coming to a complete stop. He said that after Holmes stopped the Caprice, Holmes telephoned him and told him the identity of the driver, Marcus Blair. Munday said he went to the scene of the stop and made an identification.

On cross-examination, Munday testified that there were no confidential informants at the suspect house that evening, nor had he received any 911 calls regarding the residence that day. He also said that he did not have any warrants for the house or its occupants. He said that the suspect house was the last house on the right at the end of Bishop Street, which is a dead end street. He said that the other end of Bishop intersects with Sycamore Street. Munday testified that he was parked in the driveway of a vacant house, which was the third, fourth, or fifth house on Bishop from the suspect house.

Munday testified that he did not know the person who got out of the Caprice and that the person never entered the suspect house. He said that he believed that the hand-to-hand transaction he witnessed was a drug transaction, based upon his training. Munday acknowledged that he did not see the transaction clearly enough from his vantage point to arrest the defendant based upon what he had seen. He restated that he communicated to Officer Holmes that he believed he had seen a drug transaction. He said that he remained in his car as the defendant drove past and that he radioed to Holmes that the car had left. He said that he telephoned Holmes a third time and told him that the car had not made a complete stop at the stop sign. He said that this third communication occurred before Holmes stopped the defendant. He said that although the defendant might have tapped the brakes, the defendant did not come to a complete stop at the stop sign. He said that he did not see Holmes following the Caprice but that he did see Holmes' patrol car pass.

Munday identified Exhibit 1 as a map of Bishop Street and identified the highlighted house as the suspect house at the end of Bishop Street. He stated that he was parked at the fourth or fifth house away from the suspect house. Munday said that although he was concerned about the potential for guns and violence in connection with drug transactions, he did not go to the scene

4

where Holmes had stopped the defendant until Holmes called him. He said that he had already heard about the stop on his police radio before Holmes called him.

On redirect examination, Munday testified that he was using his binoculars the entire time he surveilled the suspect house and that nothing blocked his view of the house. He said that once Holmes identified the driver of the Caprice as the defendant, he was alarmed due to his past dealings with the defendant and went to the scene of the stop. He said that once at the scene, he confirmed that the car Holmes had stopped was the one he saw related to the drug transaction and that rolled through the stop sign. On recross-examination, Munday agreed that he viewed all of the observations to which he had testified from the vantage point of his unmarked police car.

The government next called KPD Officer Jeff Holmes. Holmes testified that he had worked for the KPD for five and one-half years and that for the past twenty-two months was assigned to the Community Response Team. He said that as a member of this unit, he works on narcotics and prostitution investigations and has attended advanced narcotics investigation classes. He stated that he had participated in hundreds of arrests, one-half of which were for narcotic-related offenses. He said in March 2004, he was assigned to the West District. He said on the evening in question, he was focused on Bishop Street in the Lonsdale area. He stated that through community meetings and drug complaints, the KPD's attention was directed to the house at the end of Bishop street, which was believed to be used for drug dealing. He said that he had initiated a "problem solving kit" on that residence, which means that either undercover surveillance or directed patrols were focused on the residence.

Holmes testified that on March 25, 2004, he was working the 4:00 p.m. to midnight shift with his partner, Officer Munday. On that day, he was assigned to uniformed patrol in a

marked police car equipped with a video camera. He said that he was parked on Sycamore Street while Munday was surveilling a location on Bishop. Holmes testified that around 10:30 p.m., he received a Nextel communication from Munday that a car was leaving the surveilled location. He then saw an older model Chevrolet Caprice traveling from Bishop onto Sycamore, and he stopped the car at the intersection of McPherson Street for a "tag light violation."

Holmes testified that he approached the car, told the driver the reason he had stopped him, and asked for his driver's license and proof of insurance. He said that the driver seemed "a little nervous" and wanted to get out of the car to look at the tag light. He said that he was concerned that the driver might try to flee and that he told the driver not to get out of the car. Upon receiving the driver's license, Holmes returned to his patrol car and ran a computer check on the license number. The results of the check revealed that the license was valid. Holmes testified that he communicated with Munday again via the Nextel and learned that Munday had seen the car roll through the stop sign at the corner of Bishop and Sycamore. Munday also told him that he had seen what he believed was a hand-to-hand drug transaction between the driver of the Caprice and a resident of the house under surveillance. Holmes testified that after receiving this information from Munday, he requested backup and also asked Munday to come to the scene to verify that the Caprice was the car about which Munday was talking.

Holmes identified Exhibit 2 as the videotape from his video camera on March 25, 2004. The video was played, and Holmes narrated what was happening. Holmes testified that at 22:39:12, he was parked at a business on Sycamore Street, watching the intersection of Sycamore and Bishop Street. Holmes stated that at 22:39:23, he heard a report of a car leaving and that he then began following the car. He said that he initiated a traffic stop. He said that he had not received

6

additional information from Munday at 22:41:00. Holmes stated that he received the defendant's driver's license and, at 22:42:31, he was inside his patrol car, waiting for records to complete a check of the defendant and announce his license status. He said that as he watched the defendant from his cruiser, the defendant seemed "a little fidgety" and appeared to be moving his hands underneath the seat of his car.

Holmes testified at 22:44:23, he had begun to fill out a citation, citing the defendant for a tag light violation and the failure to provide proof of insurance. He said that at 22:45:53, he received information from records and that at 22:46:18, he communicated with Munday via the Nextel. He said that at 22:48:56, he spoke with the defendant and asking him whether there was anything in his car. He said that the defendant seemed nervous and agitated and was moving around. Holmes said that this caused him to be concerned that the defendant could be hiding a weapon or narcotics in the car. He said that at 22:49:37, he again communicated with Munday on the Nextel telephone and that Munday told him that Munday had observed the car fail to make a complete stop at the intersection of Sycamore and Bishop. He said that Munday also told him that Munday believed he had seen an hand-to-hand drug transaction relating to the car. Holmes said that he asked Munday to come to the scene but to park in a secluded area so that Munday would not reveal his undercover car to the defendant. Holmes said that during the time he was talking with Munday, the defendant was moving around in his car.

Holmes testified that the videotape reflects that at 22:50:12, he explained to the defendant that he stopped the defendant because he could not see his tag light, which is required to be visible from fifty feet, until he was right behind the defendant's car. He said at 20:51:07, while he was speaking to the defendant, the defendant was reaching around in the car, underneath the seat,

and toward his ankle area. He said he asked the defendant to stop reaching because he was concerned that the defendant might be reaching for a weapon. He said at this point, he requested a backup unit. He stated that at 22:52:56, he was back in his patrol car speaking with other officers on his Nextel telephone, writing out the citation, and observing the defendant, who continued to move around inside the Caprice. He said that based upon his experience, the defendant seemed more nervous than an individual in the typical traffic stop.

Officer Holmes testified that at 22:53:14, the defendant began speaking with a couple of pedestrians. He said that the defendant opened the car door, and Holmes thought the defendant was going to flee. He stated that he directed the defendant to remain in his car. Holmes testified that around 22:54:24, he turned his patrol car's lights off in order to observe the defendant's tag light. He said that when he had first seen the defendant's car, he did not think it had a tag light. He stated that during the traffic stop, he thought he saw the defendant's tag light illuminate again so he turned off his lights to examine it. He said that the defendant's tag light was "very small" and that he could not read the defendant's license tag from ten feet away.

Officer Holmes testified that subsequently, Officer Munday arrived and identified the defendant's car. He said that he reviewed his recording of the defendant's car to see whether he could confirm that the defendant rolled through the stop sign at Sycamore. He said that the videotape [Ex. 2] shows a blue screen during the time he was reviewing it that evening. He said that at 22:57:54, the videotape shows Munday examining the defendant's tag light. Holmes testified that the requested backup unit arrived at 22:58:55. He said at 22:59:28, the defendant was still moving around in his car and that the defendant adjusted the rearview mirror, ostensibly to observe the officers who were behind him. Holmes said that at one point, the defendant had said he was looking

8

around for his cellular telephone but that when Holmes approached the car, he saw the phone lying on the seat.

Officer Holmes testified that at 23:01:34, the defendant called to him through the car window, questioning the stop and any search of the car. Holmes said he repeatedly explained to the defendant that it was the defendant's choice whether to consent to a search and that a drug detection dog was en route to the scene. At 23:02:28, the canine unit arrived. Holmes stated that at 23:02:52, he told the defendant that he had to get out of the car for the canine search. He said at 23:03:31, while he was conducting a pat down of the defendant, he felt a large lump in the defendant's right pant leg. Holmes said that when the pant leg was moved, a large baggie filled with several small baggies fell from the pant leg to the ground. He said he believed that the baggie contained crack cocaine. He said that once he discovered the narcotics, he asked the defendant if that was the reason the defendant was nervous, to which the defendant relied, "Yes." Holmes said that he began handcuffing the defendant and that Munday retrieved the baggie from the ground. He said the defendant was taken into custody, and the defendant's car was searched incident to the defendant's arrest.

On cross-examination, defense counsel replayed the videotape as he questioned Officer Holmes. Holmes testified that as he waited on Sycamore, his patrol car's lights were off. He said that although he could not see the suspect house on Bishop from his location, he had been in communication with Officer Munday via his Nextel telephone and knew that there was a car at the suspect house. He said that an unrelated car drove by at 22:39:05 on the videotape. He agreed that he could not see the license tag on that car as it passed. He stated that Munday told him a car was leaving the suspect house and that the car reached the intersection of Bishop and Sycamore at

22:39:22 on the videotape. He said the videotape reveals that although the car "addressed the stop sign," its wheels remained in motion, and it did not come to a complete stop. Holmes acknowledged that the car's brake lights were activated. He stated that he was parked over one hundred feet from the intersection and that a sign, a telephone pole, and some tree limbs were between his video camera and the defendant's car.

Officer Holmes testified that at 22:39:26 on the videotape, he had turned on his lights and pulled behind the defendant's car. He said the car's brake lights were illuminated as the car went over a hill and that once he was directly behind the car, his lights were shining on the car's rear panel. He said that as the car went through a turn, his lights were no longer illuminating the rear of the car. He said at that point, he confirmed that he could not see the car's license plate. He stated that he stopped the car shortly thereafter. Holmes reiterated that he did not see the license plate when he was within fifty feet of the defendant as the defendant's car made the turn and stated "[d]uring the whole thing I was carrying on conversations with Officer Munday regarding a vehicle with the possible stuff going on at the house, the vehicle leaving from the residence."

Officer Holmes testified that after he stopped the defendant, he illuminated the scene with the spotlights on his patrol car. He said that he initially believed that the defendant's tag light was burned out but later confirmed that the car did have a tag light that would illuminate. He said that he still did not believe there was a problem with the stop because the car's tag light was shining so faintly that it was not visible from twenty feet, much less the fifty feet required by law. He agreed that he reviewed the videotape at the scene to reconfirm his reasons for the stop, after he realized that the defendant's tag light was working.

Holmes testified that after he stopped the defendant and told him the reason for the

10

stop, the defendant asked if he could look at the tag light. Holmes declined to let the defendant view the license plate and proceeded to radio dispatch with the defendant's driver's license number. He said that at 22:45:31 on the videotape, he received information from records confirming that the defendant's license was valid. He said that he had already questioned the defendant about car insurance at that point. He agreed that at this point in time, he had enough information to write a citation for no proof of insurance and a burned out tag light but said that he had also received information from Munday on a possible hand-to-hand drug transaction. He said that he asked Munday to come to the scene to confirm what he had seen.

Officer Holmes testified that at 22:46:03, Munday called him to ask which Blair had been stopped. He said that when he told Munday it was Marcus Blair, Munday told him about previously arresting the defendant. He said that he told Munday he was going to ask the defendant if he would consent to a search of the car. Holmes testified that by 22:48:16 on the videotape, he had asked the defendant if there was anything illegal in the car, to which the defendant responded, "No." The defendant said that he did mind if the officer looked in his car. Upon further questioning by Holmes, the defendant said he was in the area visiting his aunt. Holmes informed the defendant that he saw him leaving a street, which contained a well-known drug house. Holmes said that at 22:48:24, he had not given the defendant the Miranda warnings and that he told the defendant that he was not under arrest and that his driver's license was fine.

Officer Holmes agreed that the defendant was upset during the stop and was questioning why he had been stopped. He said that at 22:49 on the videotape, he had called for a canine unit to come to the scene. He stated that at 22:51:05, he called for a backup unit. At 22:54:20, the lights on Holmes' patrol car were turned off. Holmes agreed that at that point, he saw

11

a "very dim light" on the defendant's license tag.  After this, Holmes rewound the videotape and the reviewed it on the scene.  Holmes testified that at 22:57:50, the videotape depicts Munday examining the defendant's tag light.  He said that at 23:01:54, he told the defendant that he had reviewed the videotape and that the defendant did not come to a complete stop at the stop sign.  He said the defendant said that he had "roll stopped."  Holmes testified that at 23:02:52, he told the defendant that the canine unit had arrived and that he had to get out of the car before the dog searched it.  He said that the defendant got out at his request.  He said that although he did not know that the defendant had a weapon, he suspected that the defendant might be armed because of the reaching the defendant was doing in the car, and because Munday had told him about prior dealings with the defendant involving a weapon.

On redirect examination, Holmes testified that during one of their Nextel communications at the scene, Munday, upon learning the defendant's identity, had told him that Munday had previous dealings with the defendant in which the defendant had an assault rifle.  He said that Munday also told him that the defendant had fled on that occasion.  Holmes said that he kept the defendant in his car until backup officers arrived for safety reasons.  He said that when an individual is nervous, it could mean that they might flee or that the might have a weapon.  Holmes stated that when he turned his patrol car's lights off at the scene, he could not see the defendant's license tag clearly even though he was only twenty feet from the defendant's car.

On recross-examination, Holmes testified that he had 20/20 vision with contacts.  He said that he initiated the traffic stop after the defendant turned perpendicular to his patrol car.  He stated that at that time, he believed the defendant's tag light was burned out.

The defendant called Charles A. Brown, an investigator with the Federal Defenders

Office.  He said that he created a videotape of the defendant's car in order to reconstruct whether Officer Holmes could have seen the defendant's license tag on the evening of the stop.  He said that on April 3, 2005, he went to the home of Gordon Davis, who had the defendant's car.  Mr. Brown said that he placed his own car fifty feet behind the defendant's car.  He stated that when his headlights were on, he could only see his lights reflected on the back of the defendant's license tag. He stated that when he turned his headlights off, he could clearly see the defendant's license tag, which was illuminated by a tag light.  He said that he also viewed the defendant's license tag from seventy-one feet away while the defendant's mother's car was beside the defendant's car.  He said that the defendant's mother's car had a faulty tag light and that although he could see the license tag, he could not read the license plate number clearly.  He said that he could definitely still read the defendant's license plate from seventy-one feet away.  Defense counsel played a videotape [Ex. 3] illustrating this testimony.

Mr. Brown testified that he also visited the scene in conjunction with his investigation of the case.  With the aid of a map of Bishop Street [Ex. 1], he located the house under surveillance, which was the last house on the right side of Bishop by a dead end.  Mr. Brown said that he took photographs of Bishop Street [Coll. Ex. 4] on June 27, 2005.  He testified that the stop sign at the intersection of Bishop and Sycamore Streets was not visible from the dead end.  He said that Bishop curves in the center and that the stop sign was not visible from the dead-end-side of the curve. According to Brown, the stop sign first became visible from the side of the curve closest to the intersection.  He stated that there were six houses on the same side of Bishop as the suspect house between the suspect house and the curve.

On cross-examination, Mr. Brown acknowledged that he created the videotape of the

defendant's tag light a little over a year after the defendant's car was stopped on March 25, 2004.

He agreed that he knew the defendant's license plate number before he created the videotape of the

defendant's tag light and that he did not record the defendant's car in motion. He testified that he

took the photographs of Bishop Street on June 27, 2005, over a year from the stop and during a

different season. He agreed that the trees, which were green and in full bloom in the photographs,

would not have been so in March. He acknowledged that he could have seen further if he had been

using binoculars, although he denied that he could have seen the stop sign from the dead end.

On redirect examination, Mr. Brown testified that Bishop Street was 932 feet long

from the dead end to the intersection with Sycamore Street.

The defendant next called Shelia Roberts, the defendant's mother. Ms. Roberts

testified that the defendant was driving a 1988 gray Caprice Classic on March 25, 2004. She said

that the car was taken to an impound lot from the scene. She said that she retrieved the car from the

impound lot on November 29, 2004, and took it directly to her cousin's house. She said that no

work has been performed on the car since that time.

On cross-examination, Ms. Roberts testified that her cousin lives in East Knoxville

and that she lives in West Knoxville. She said that when she left the car at her cousin's house, she

retained possession of the only set of keys to the car. She agreed that someone replacing a light on

the back of the car would not need a key. She acknowledged that she was not with the defendant's

car everyday.

The defendant also called Gordon Davis, who is the defendant's mother's cousin.

Mr. Davis testified that the defendant's Caprice had been at his house since the preceding

November. He said that the defendant's mother had asked if she could bring the defendant's car to

his house and park it in his driveway. He said that no one had taken the car since it had been parked there in November 2004 because he had possession of the keys. He said that he had not done any work to the car, nor did he have any knowledge of anyone else working on it.

On cross-examination, Mr. Gordon testified that the defendant's mother had asked to park the car in his driveway because it was raining the day she picked it up. He said that she did not want to drive it across town in the rain.


## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The defendant argues that his rights under the Fourth Amendment were violated because the officer lacked probable cause or reasonable suspicion to stop his car. He also contends that even if the stop was valid at its inception, the officer detained him for an unreasonable length of time and beyond the purpose of the traffic stop while waiting for the drug detection dog to arrive. The Court will address each of these contentions in turn.


### A. Propriety of Stop

A seizure or arrest is not unreasonable under the Fourth Amendment if supported by probable cause: "Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime." United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996). A police officer may also briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that

the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure."

United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). The defendant disputes that Officer Holmes had either probable cause or reasonable suspicion to stop him on March 25, 2004.

*1. Probable Cause to Stop for Tag Light Violation*

The defendant argues that the officer lacked probable cause to stop him for violating a local ordinance because his rear license-plate lamp was properly illuminated on March 25, 2004. He maintains that Officer Holmes was never at an angle at which Holmes could have observed the defendant's license plate when Holmes' own lights were not reflecting on the defendant's plate. He also contends that both the videotape [Ex. 2] from Holmes' cruiser and the videotape [Ex. 3] created by Charles Brown demonstrate that the defendant's tag light was working on the night in question. The government responds that Holmes' testimony and the videotape from his cruiser [Ex. 2] establish that the defendant's tag light was not sufficiently illuminating the defendant's license plate so as to render it legible from a distance of fifty feet as required by local ordinance. Thus, the government contends that Holmes had probable cause to stop the defendant for this traffic violation.

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds

16

for belief supported by less than prima facie proof but more than mere suspicion," <u>United States v.</u> <u>Bennett</u>, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. <u>Ferguson</u>, 8 F.3d at 392 (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 244 n.13 (1983)). If a traffic stop is properly supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." <u>Id.</u> at 391. The Sixth Circuit has stated that probable cause to believe that a traffic violation has occurred permits a stop for that violation, "no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." <u>United States v. Mesa</u>, 62 F.3d 159, 162 (6th Cir. 1995).

Officer Holmes testified that he was parked at a business on Sycamore Street with his lights off when he saw the defendant's vehicle drive from Bishop Street onto Sycamore. He stated that he began following the defendant's car and that he believed the defendant's tag light was burned out. He stated that when the defendant turned from Sycamore onto McPherson, he confirmed that he could not see the defendant's license plate and proceeded to stop the defendant. He maintained that he was fifty feet away from the defendant at the time the defendant made this final turn. After stopping the defendant, he told the defendant the reason for the stop was that the defendant's tag light was not working. He also began to fill out a citation for the absence of a tag light. At one point, Holmes turned off the lights on his patrol car and realized that the defendant's tag light was, in fact, operational. Even so, Holmes testified that he believed the stop was still valid, because the defendant's tag light was so dim that it did not render the defendant's license plate legible from twenty feet away.

Knoxville City Code § 17-379(c) provides that "[e]ach lamp and stoplight required

17

in this section shall be in good condition and operational." Knoxville City Code § 17-379(b)(4) requires that

> No person shall operate a motor vehicle on the public streets of the city or property owned by or leased to the city's community development corporation unless such vehicle is equipped with an operating lamp or lamps so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from fifty (50) feet to the rear. Any such lamp or lamps shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted. This subsection shall not apply to any motor vehicle assembled or manufactured prior to January 1, 1968.

The defendant contends that the videotape [Ex. 2] from Holmes' cruiser shows that the defendant's tag light was operational on the night in question. He asserts that Holmes admits as much after the portion of the videotape in which Holmes turns off the lights on his patrol car. Additionally, he maintains that Charles Brown's demonstrative videotape [Ex. 3] reveals that the defendant's tag light rendered the defendant's license plate visible from distances of fifty and seventy-one feet away. Finally, he questions the credibility of Holmes' testimony by arguing that Holmes was never in a position to view the defendant's tag light when the defendant's license plate was not also illuminated by Holmes' lights before the stop.

The Court has reviewed the testimony of Officer Holmes and the two videotapes and finds Holmes' testimony to be credible. Holmes stated that he first believed the defendant's tag light was burned out but later observed it dimly illuminated. During cross-examination, he explained this discrepancy by stating that there may have been a "short" in the vehicle's wiring. In any event, he believed that the stop was valid because the dimly lit license plate was not legible from a distance of twenty feet. The Court finds that Holmes could have observed whether the defendant's tag light was working properly as the defendant turned from Sycamore onto McPherson. Moreover, the

18

Court finds that the explanation of a short in the defendant's tag light is consistent with the tag light's lack of illumination in the turn, dim illumination at the scene of the stop, and apparent full illumination in Mr. Brown's videotape, which was created over one year after the stop. Accordingly, the Court finds that Holmes had probable cause to stop the defendant for violating local ordinance 17-379(b)(4), which requires that a tag light illuminate a car's license plate so as to render the license plate visible from fifty feet to the rear.

The defendant argues that Holmes intended to stop any car that had been at the suspect house and that, thus, the claimed tag light violation was merely a pretext to conduct a "fishing expedition" for illegal drugs. The defendant notes that a traffic violation can justify an investigative stop of a car without regard to the officer's subjective reason for the stop. See Whren v. United States, 517 U.S. 806, 813 (1996); see also Ferguson, 8 F.3d at 391. However, he maintains that in this case, no such traffic violation occurred. The Court has found that Holmes had probable cause to stop the defendant for a tag light violation. Thus, Holmes' subjective reason for wanting to stop the defendant in the hope of searching his car for drugs is immaterial to the Fourth Amendment analysis. See Ferguson, 8 F.3d at 391.


*2. Probable Cause to Stop for Stop Sign Violation*

The government contends that Officer Holmes also had probable cause to stop the defendant for his failure to come to a complete stop at the stop sign at the intersection of Bishop and Sycamore Streets. It contends that Officer Munday saw this traffic violation and communicated it to Holmes. Thus, the government asserts that Holmes could also stop the defendant for this violation under the collective knowledge doctrine. The defendant contends that Munday was not

19

in a position to see the defendant navigate the intersection of Bishop and Sycamore from his surveillance post due to the curve in Bishop Street. He also argues that the collective knowledge doctrine does not apply because Munday did not inform Holmes that Munday saw the defendant roll through the stop sign until after Holmes had already stopped the defendant.

The Sixth Circuit has held that "probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." Collins v. Nagle, 892 F.2d 489, 495 (6th Cir. 1989). "The correct test is whether a warrant if sought could have been obtained by law enforcement agency application which disclosed its corporate information, not whether any one particular officer could have obtained it on what information he individually possessed." United States v. McManus, 560 F.2d 747, 750-51 (6th Cir. 1977) (assessing the collective knowledge of federal and local officers). The defendant does not dispute that probable cause can arise from the collective knowledge of the police. Instead, he argues that the facts and circumstances supporting probable cause must have been communicated from the witnessing officer to the stopping officer before the doctrine can be employed.

The defendant is correct that the collective knowledge doctrine contemplates some communication between the various police officers and/or agencies. The Supreme Court has affirmed the stop of a defendant by officers of one police department who were relying upon a flyer from another police department stating that the defendant was wanted for a felony investigation. United States v. Hensley, 469 U.S. 221, 235 (1985). The Court reasoned that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies" an investigatory stop even though the flyer did not inform the stopping officers of those articulable facts. Id. at 232.

20

Instead, the stop violates the Fourth Amendment if the officers issuing the flyer or bulletin lacked reasonable suspicion. Id.

Moreover, the Sixth Circuit has applied the collective knowledge doctrine when officers working together on an investigation each independently knew information contributing to probable cause. Collins, 892 F.2d at 495. "Since the knowledge of the mining investigators working together on the scene and in communication with each other is *mutually imputed*, we do not require that every arresting officer possess all of the information that, when amassed, gives rise to probable cause." Collins, 892 F.2d at 295 (emphasis added).

In the present case, neither Munday nor Holmes testified that Munday directed Holmes to stop the defendant's car. Thus, this case appears distinct from the situation in Hensley and more akin to that in Collins. Moreover, although Munday testified that he informed Holmes of the defendant's failure to stop at the stop sign before Holmes stopped the defendant, Holmes did not cite the defendant's actions at the stop sign as a basis for his stopping the defendant. Instead, Holmes testified that he stopped the defendant for the tag light violation and that he had been in communication with Munday about the defendant's actions at the suspect house.

In this respect, the present case most resembles the situation in United States v. Woods, 544 F.2d 242 (6th Cir. 1976). In Woods, agents monitoring intercepted telephone communications learned of a large drug shipment arriving at a particular location. Id. at 258. The agents took up surveillance of the location and determined that they had probable cause to arrest anyone arriving and then quickly leaving the location. Id. Around the same time, a supervising officer, Garibotto, who was not at the location, was informed of two other intercepted calls linking Defendant Jones to other persons involved in the drug trade and identifying Defendant Hurt as a

substantial customer. Id. Garibotto ordered the arrests of Jones and Hurt. Id. The court held that neither Garibotto's knowledge of information relating to Hurt and Jones nor his ordering their arrests could provide probable cause for their arrests "because there was no evidence that any of his comments had been communicated to the agents on the scene who actually made or ordered their arrests." Id. In addressing the government's collective knowledge argument, the court stated

> When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause. Likewise, when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest. But here, in contrast, because there was no evidence that Garibotto's order to arrest either Jones or Hurt was the *basis of their arrests*, his knowledge cannot be considered in determining probable cause. On the other hand, we do mutually impute the knowledge of all the agents working together on the scene and in communication with each other.

Id. at 260 (emphasis added). Thus, Garibotto's knowledge was not part of the collective knowledge of the arresting agents on the scene because it was never communicated to any of the agents from whom the probable cause to arrest the defendant was derived and it did not contribute to the basis for the defendants' arrests.

The Court finds that the present factual scenario presents a closer case because information relevant to the stop (i.e., information about the defendant's actions at the suspect house) and information not a basis for the stop (i.e., the stop sign violation) were known to a single officer who was in communication with the stopping officer. Nevertheless, the Court finds that Holmes did not testify that he knew about the stop sign violation before he stopped the defendant, nor did

22

Holmes ever indicate that the stop sign violation was part of his probable cause to stop the defendant. For example, Holmes did not tell the defendant that he stopped him for a tag light violation and running a stop sign. In looking at these particular facts, the Court is not trying to determine Holmes' subjective intent in stopping the defendant. Instead, the Court is compelled to examine the totality of facts and circumstances known to the officer at the time of the stop to ascertain whether the officer had probable cause. Accordingly, the Court determines that Munday observed a separate traffic violation that was not a basis for stopping the defendant and, therefore, cannot provide probable cause for the stop through the collective knowledge doctrine. The Court finds that Munday's knowledge of the stop sign violation in the present case was akin to one of the backup officers, who arrived at the scene after the stop, informing Holmes that he had seen the defendant roll through a stop sign earlier that evening. The collective knowledge of the defendant's actions at the house on Bishop Street are another matter and will be discussed in the next section.

Finally, the factual question of whether Munday could have physically witnessed the defendant's actions at the intersection from his location on Bishop Street is largely irrelevant in light of the Court's finding that this information cannot provide probable cause for the stop. Nevertheless, based upon Munday's testimony, the map [Ex. 1], the photographs [Coll. Ex. 4], and Charles Brown's testimony on cross-examination, the Court finds that Munday could physically view the intersection from his location at the fourth or fifth house on Bishop in the early spring when the leaves were not yet upon the trees. The Court finds that Munday's use of binoculars would have further aided his view.

*3. Reasonable Suspicion to Stop*

The Court has already decided that Officer Holmes had probable cause to stop the

defendant for a tag light violation.  In the event that the District Court disagrees with this finding, the Court will also discuss whether Holmes had reasonable suspicion to stop the defendant independent of any traffic violations.  The government contends that the officers could conduct a Terry stop of the defendant's car because they had reasonable, articulable suspicion that the defendant possessed narcotics based upon the observations at the house on Bishop Street.  The defendant argues that Holmes did not have reasonable suspicion to stop the defendant because (1) Munday did not witness any criminal activity involving the defendant at the suspect house, (2) Holmes did not know that the vehicle he stopped was the same one that Munday observed leaving the suspect house, and (3) Holmes did not know about the alleged hand-to-hand drug transaction from Munday until after he stopped the defendant.

As noted above, an officer may stop a motorist on less than probable cause if the officer has a reasonable suspicion based upon specific and articulable facts that the person is involved in criminal activity.  See Martin, 289 F.3d at 396.  The presence of reasonable suspicion is assessed by examining the totality of the circumstances.  United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398.  Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  Arvizu, 534 U.S. at 274.

Looking to the totality of the circumstances in the present case, Holmes and Munday both testified that on the evening of March 25, 2004, they were working together to investigate possible drug activity at a house on Bishop Street, for which the KPD had received numerous citizen complaints about drug traffic.  With the aid of binoculars, Munday was surveilling the residence in

24

an undercover capacity from his car, which was parked in the driveway of a home four or five houses away from the suspect house. Munday testified that he saw an individual arrive in a Caprice and speak with the owner of the house outside the residence for fifteen to twenty minutes. He said that he then observed what he believed, based upon his training and experience, was a hand-to-hand drug transaction. He watched the driver of the Caprice leave the house and drive on Bishop to Sycamore Street. Munday testified that he called Holmes, who was parked at a business on Sycamore, and told him of the hand-to-hand transaction and that the car was leaving.

Officer Holmes testified that he was in a patrol car on Sycamore Street and was communicating with Munday, who was surveilling the suspect house, via their Nextel telephones. Holmes testified that Munday told him a car was leaving the suspect house, that he got behind the car after it turned from Bishop onto Sycamore, and that he stopped the car after it turned onto McPherson Street. Holmes' testimony is not clear on precisely when Munday informed him that Munday had observed a hand-to-hand drug transaction. During his narration of the videotape [Ex. 2] from his in-car camera, he stated on both direct and cross-examination that Munday called him and told him about the hand-to-hand transaction after he had stopped the defendant. On the other hand, he also states that he was in constant communication with Munday regarding the car in question and "the possible stuff going on at the house" as he was following the defendant before the stop. On cross-examination, Holmes also stated, "I was carrying on a conversation via Nextel with Officer Munday prior to the stop also about a vehicle and everything up there at the residence." These statements reveal, at the very least, that before Holmes stopped the defendant, Holmes was communicating with Munday about the defendant's activities at the suspect house, even if Holmes did not know the specific fact that Munday believed he had observed a hand-to-hand drug

25

transaction.

Based upon these circumstances, the Court finds that Holmes had reasonable suspicion to stop the defendant to investigate his involvement in a possible drug transaction. First, the Court notes that the defendant had been to a known drug house in a high-drug trafficking area. "The fact that a given locale is well known for criminal activity will not by *itself* justify a Terry stop; but it is among the various factors that officers may take into account." Martin, 289 F.3d at 397; see also Watkins v. City of Southfield, 221 F.3d 883, 888-89 (6th Cir. 2000). Additionally, the lateness of the hour in combination with the area's reputation as a locale for criminal activity can contribute to reasonable suspicion. See, e.g., United States v. Bailey, 302 F.3d 652, 659 (6th Cir. 2002) (examining a stop at 1:00 a.m. in an area known for criminal activity). The Court notes that the defendant stopped at the suspect house during the evening hours.

Importantly, Munday observed what he believed was a hand-to-hand drug transaction between the defendant and the owner of the suspect house. The defendant challenges this observation, contending that Munday described no specific facts indicating criminal activity between the defendant and the home owner and that the men could have been merely shaking hands. Munday testified regarding his experience as an undercover officer engaging in controlled purchases of drugs. He described a hand-to-hand drug transaction as a covert transaction in which money was physically exchanged for drugs. Munday testified that following the defendant's conversation with the home owner, he saw the defendant engage in what he believed, based upon his training and experience, was a hand-to-hand drug transaction. The Court finds that based upon Munday's description of a hand-to-hand drug transaction, Munday observed more than a handshake. The Court finds that his statement that he observed a hand-to-hand transaction reveals that he witnessed

an *exchange* between the defendant and the home owner. The Court notes that Munday testified that he did not believe that he had probable cause to arrest the defendant based upon this observation. The Court finds that this testimony does not negate the value of the observation in assessing reasonable suspicion, which is a lower standard that probable cause.

The defendant relies upon a case from the District of Columbia Circuit to argue that one person handing an object to another in a high-crime area is insufficient to provide reasonable suspicion for a Terry stop. See United States v. Johnson, 212 F.3d 1313, 1316 (D.C. Cir. 2000). The Court finds this case distinguishable, because in Johnson, the District of Columbia noted that the officer did not see the recipient of the object give the person handing the object anything in exchange. Id. In the present case, the Court finds that Munday's reference to a hand-to-hand transaction meant that Munday had witnessed an exchange. In addressing the issue of probable cause to arrest a defendant, the Sixth Circuit has characterized an officer's observation of an exchange of items between two parties as a "sequence of events typical of a drug transaction," even if the officer could not identify the items exchanged. United States v. Richard, No. 92-5122, 1992 WL 361366, *3 (6th Cir. Dec. 8, 1992). In the present case, the Court finds that the covert, hand-to-hand drug transaction witnessed by Munday, which was taking place after dark in front of a known drug house in an area known for drug trafficking, provided specific and articulable facts justifying the officers' reasonable suspicion to stop the defendant.

The defendant's remaining two arguments relate to Holmes' ability to stop the defendant based upon Munday's observations. The defendant states that Holmes did not know whether he was stopping the car that Munday saw leave the suspect house. The Court finds that as the Caprice was leaving the house, Munday telephoned Holmes and told him that the car was

leaving.  Although Holmes could not see the car leaving the residence, he testified that Munday called him and told him that the car was leaving at 22:39:23 on the videotape [Ex. 2].  The videotape reveals that the defendant's car arrived at the intersection of Bishop and Sycamore within one second of Munday's call.  Based upon the time of day, the limited amount of traffic in the area as demonstrated by the videotape, and the brief lapse of time between Munday's call and Holmes seeing the car, the Court finds that Holmes could reasonably conclude that the defendant's car was the one that left the residence.

Finally, the defendant contends that Holmes did not learn that Munday observed a hand-to-hand transaction until after he stopped the defendant.  As addressed above, the exact time that Holmes learned that information is not clear.  In any event, the Court finds that reasonable suspicion arose based upon the collective knowledge of the two officers.  As discussed in the previous section, reasonable suspicion can arise from the collective knowledge of the police, rather than only from the stopping officer.  See Hensley, 469 U.S. at 232; Collins, 892 F.2d at 495.  Thus, the stopping officer does not have to know every detail contributing to reasonable suspicion to stop.  Id.  In the present case, the Court finds that Holmes could stop the defendant based upon his and Munday's collective knowledge of the events that occurred at the suspect house because they had been in constant communication during the investigation that evening.  See Woods, 544 F.2d at 260. Accordingly, the Court finds that Holmes had reasonable suspicion to stop the defendant independent of any traffic violations.

**B.  Length of Detention**

The defendant also argues that, even if the stop itself did not violate the Fourth

Amendment, the officers detained him for an unreasonable length of time following the stop and well after they had completed the purpose of the traffic stop. In this respect, he maintains that the drug dog did not arrive before Holmes should have completed the traffic stop and that Holmes did not have reasonable suspicion to detain him beyond the purpose of the traffic stop. The government contends that the traffic stop was not unnecessarily prolonged because the officer had reasonable suspicion that the defendant was engaged in other criminal activity. It also asserts that the officers acted diligently in investigating their reasonable suspicions about the defendant.

"Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). In considering the reasonableness of the detention, the Court should assess "whether the officer's action was justified at its inception, and whether it is reasonably related in scope to the circumstances which justified the interference in the first place." Berkemer v. McCarty, 468 U.S. 420, 439 (1984). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397.

In the present case, the Court finds that Holmes stopped the defendant at 22:39:55 on the videotape. After the stop, Holmes requested the defendant's driver's license and proof of insurance. He testified that the defendant seemed nervous and that he told the defendant to remain in the car, because he was concerned that the defendant might attempt to flee. Holmes returned to

29

his patrol car and requested a computer records check on the defendant's driver's license number. Holmes testified that as he watched the defendant from his cruiser, the defendant seemed fidgety and appeared to be moving his hands underneath the seat of his car. Holmes related that at 22:44:23, he began to fill out a citation, citing the defendant for a tag light violation and the failure to provide proof of insurance. Shortly after 22:45:30, Holmes received the information on the records check. Holmes testified that at this point, he had all the information he needed to fill out the defendant's citations.

Holmes testified that despite having all information necessary for the citations, he was still investigating potential narcotics violations based upon the defendant's actions at the suspect house on Bishop Street. In this regard, he continued to communicate with Munday. He said that at 22:46:03, Munday told him that Munday had previously arrested the defendant, that the defendant had an assault rifle on that occasion, and that the defendant had fled. At 22:48:56, Holmes questioned the defendant about the presence of illegal substances in his car and about his reason for visiting Bishop Street that evening. The defendant declined to allow Holmes to search the car, and Holmes told the defendant he would call a drug detection dog to the scene. Holmes testified that during his conversation with the defendant, the defendant seemed nervous, agitated, and upset and was moving around inside the car. He said that the defendant's actions caused him to worry that the defendant was hiding narcotics or a weapon in the car. Holmes communicated with Munday again, and Munday told Holmes he believed the defendant had failed to come to a complete stop at the stop sign at the intersection of Sycamore and Bishop. Holmes asked Munday to come to the scene to identify the defendant. At 22:49, Holmes radioed to request a drug detection dog.

At 22:50, Holmes again spoke with the defendant about the reason for the stop.

30

Holmes testified that the defendant was reaching toward his ankle area as they spoke and that he asked the defendant to stop reaching because he was concerned the defendant might be reaching for a weapon. Holmes testified that at one point, the defendant explained that he was looking around his car for his cellular telephone, but Holmes stated that he had seen the cellular telephone lying on the car seat. Holmes said that at 22:51:05, he called for a backup unit.

Holmes testified that at 22:52:56, he was in his patrol car completing the defendant's citation. At 22:54:24, Holmes turned off the lights on his patrol car to examine the defendant's tag light further. Munday arrived shortly thereafter, and Holmes and Munday reviewed the videotape. At 22:57:54, Munday examined the defendant's tag light. The backup unit arrived at 22:58:55. Holmes said that at 23:01:34, the defendant called to him and questioned him about the stop. Holmes testified that he questioned the defendant about not coming to a complete stop at the intersection of Bishop and Sycamore. He said the defendant stated that he had "roll stopped." The canine unit arrived at 23:02:28. After the drug dog arrived, Holmes asked the defendant to get out of the car so that the dog could search it. At 23:03:31, Holmes frisked the defendant. Holmes testified that he felt a large lump in the defendant's pant leg. Holmes moved the pant leg, and a baggie containing what Holmes believed was crack cocaine fell from it. Holmes proceeded to arrest the defendant. The defendant's car was then searched.

An officer who stops a person for a traffic violation based upon probable cause can detain the person while he or she completes a records check and issues a citation. See United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999). Moreover, our Supreme Court has recently held that a drug dog sniff of an individual's car during the course of a valid traffic stop does not violate the Fourth Amendment. Illinois v. Caballes, 125 S. Ct. 834, 838 (2005). In the present case, Holmes

acknowledged that he had enough information to complete the citations for the traffic stop around 22:45:30. Nevertheless, Holmes detained the defendant an additional seventeen minutes before the drug detection dog arrived and another minute beyond that before finding the contraband in the frisk. The Court finds that the traffic stop was or should have been completed well before the drug dog arrived and, thus, the defendant's detention is distinct from that in Caballes. Accordingly, the defendant could only be detained for the additional eighteen minutes if the officers had reasonable suspicion to investigate other criminal activity on the part of the defendant. See Hill, 195 F.3d at 264.

As explained earlier, the presence of reasonable suspicion is assessed by examining the totality of the circumstances. United States v. Smith, 263 F.3d 571, 588 (6th Cir. 2001); Martin, 289 F.3d at 396. Such reasonable suspicion must be based upon specific and articulable facts that a crime is occurring or has occurred. Id. In the present case, the totality of the circumstances reveal that Holmes had reasonable suspicion to detain the defendant beyond the receipt of information from records. Initially, the Court would note that the bases for reasonable suspicion discussed in relation to the stop–the defendant's actions at the known drug house on Bishop Street during the evening hours–also provide reasonable suspicion to detain the defendant in order to investigate his involvement in a potential drug transaction. In this regard, Holmes testified that after stopping the defendant, he spoke with Munday about Munday's observing the defendant conduct a hand-to-hand drug transaction at the house on Bishop Street.

Another circumstance supporting reasonable suspicion is Holmes' testimony that the defendant seemed unusually nervous throughout the traffic stop. While nervousness alone cannot be the sole basis for reasonable suspicion, "nervous, evasive behavior is a pertinent factor in

determining reasonable suspicion." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000). In addition to this heightened nervousness, Holmes testified that he observed the defendant fidgeting, moving around in his car, and making reaching movements underneath the seat. Holmes believed that the defendant was untruthful in explaining the reaching by stating that he was looking for his cellular telephone, because Holmes had seen a cellular phone lying on the seat. Instead, Holmes stated that he believed the reaching motions indicated that the defendant was hiding narcotics or a weapon in the car. In articulating reasonable suspicion, law enforcement officers may draw upon their "own experience and specialized training to make inferences from and deductions about the cumulative information available to them," information that may be seemingly innocent to the untrained person. <u>Arvizu</u>, 534 U.S. at 273. Moreover, the Sixth Circuit has held a suspect's reaching into the floorboard of his vehicle contributed to the officer's reasonable suspicion. <u>Bailey</u>, 302 F.3d at 659. Thus, the defendant's nervousness, repeated reaching under the seat, and untruthful explanation of his reaching contributed to Holmes' reasonable suspicion that the defendant was involved in a narcotics violation and further justified an extension of the stop.

"In assessing whether a detention is too long in duration to be justified as an investigative stop, [the Supreme Court considers] it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." <u>United States v. Sharpe</u>, 470 U.S. 675, 686 (1985). In the present case, the Court notes that Holmes proceeded expeditiously in investigating the potential narcotics crime in questioning the defendant, seeking further information from Munday, and calling a drug detection dog to the scene of the stop. The Court also finds that Holmes' concerns about his own safety contributed to the length of the investigation. Holmes could

33

have asked the defendant to get out of the car as a part of his investigation of the traffic violation. See Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977); United States v. Burton, 334 F.3d 514, 519 (6th Cir. 2003). In this case, Holmes testified that he wanted the defendant to remain in the car because he was initially concerned that the defendant might flee due to the defendant's nervousness and desire to get out of the car to examine his tag light. Holmes received additional information from Munday–that the defendant had possessed an assault rifle and had fled on a previous occasion–that caused him further concern for his safety. Moreover, Holmes testified that the defendant could have been reaching for a weapon when he was reaching under his car seat. Thus, the Court finds that Holmes' requiring the defendant to remain in the car while he awaited backup officers was reasonable for Holmes' own protection and did not unreasonably extend the length of the detention.

Also, during the course of the detention, Holmes asked Munday to come to the scene to identify the defendant and confirm that this was the person whom Munday had seen at the suspect house. Munday arrived around 22:55, about ten minutes after Holmes had received the information from records regarding the check of the defendant's driver's license. The Court finds that having Munday confirm the defendant's participation in the activity in front of the drug house was reasonably calculated to help confirm Holmes' suspicions about the defendant. Thus, this also provided a reasonable basis to detain the defendant for at least a portion of the additional eighteen minutes. See Sharpe, 470 U.S. at 687 n.5 (affirming the stopping officer's decision to await the arrival of another officer with detailed information on the defendant).

Thus, the Court finds that the totality of the circumstances, including the observations of the defendant in front of the known drug house, the defendant's heightened nervousness, the

34

defendant's reaching under the seat, and the defendant's untruthfulness to Holmes, provided reasonable suspicion for Holmes to detain the defendant beyond the completion of the traffic stop. Moreover, the Court finds that Holmes acted diligently in investigating his reasonable suspicion, especially in consideration of his need to await back up and the confirmation of the defendant's identity by Munday. Finally, the Court finds that the eighteen-minute detention beyond the receipt of information from records was not unreasonable. See, e.g., Sharpe, 470 U.S. at 688 (upholding twenty-minute detention as reasonable when the officers acted diligently and the defendant's actions contributed to the delay); Wellman, 185 F.3d at 656 (affirming a fifteen-to-twenty-minute detention following stop for speeding). Upon his removal of the defendant from his car, Holmes could properly frisk the defendant for weapons. See Terry, 392 U.S. at 27 (holding that an officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under those circumstances would be justified in believing his or her safety was at risk); United States v. Strahan, 984 F.2d 155, 158 (6th Cir. 1993). During this frisk, Holmes discovered the contraband that led to the defendant's arrest. Accordingly, the Court finds that the length of the defendant's detention did not violate the Fourth Amendment.

### III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds no basis to suppress the evidence in this case. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress and Memorandum in Support [Doc. 9] be **DENIED**.[1]

Respectfully submitted,


_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[1]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

36